UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| DAVID R. HARGETT, | CASE NO. 5:22-CV-01774-PAG |
| Plaintiff, | JUDGE PATRICIA A. GAUGHAN |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

INTRODUCTION

Plaintiff David Hargett challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB) under Title II and supplemental security income (SSI) under Title XVI.[1] (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On October 4, 2022, pursuant to Local Civil Rule 72.2, this matter was referred to me to prepare a Report and Recommendation. (Non-document entry dated Oct. 4, 2022). Following review, and for the reasons stated below, I recommend the District Court **AFFIRM** the Commissioner's decision.

---

[1] The claims do not involve overlapping time periods, but the ALJ analyzed the claim in a single decision. (Tr. 706). Mr. Hargett does not challenge the partially favorable decision finding him disabled for purposes of SSI on March 5, 2020; he challenges only the ALJ's analysis of the DIB claim.

## Procedural Background

Mr. Hargett filed for DIB in October 2015, alleging a disability onset date of March 6, 2015. (Tr. 77). Mr. Hargett's date last insured (DLI) was March 31, 2016. (*Id.*). His claim was denied initially and on reconsideration. (*Id.*). On November 1, 2017, Mr. Hargett testified at an administrative hearing before the ALJ. (*See id.*). In December 2017, the ALJ issued an unfavorable decision on Mr. Hargett's DIB claim. (Tr. 74-90). The Appeals Council denied Mr. Hargett's request for review of the ALJ's decision. (Tr. 91-97). On appeal from this unfavorable decision, the Sixth Circuit remanded the matter to the Commissioner on July 8, 2020, because the ALJ did not provide "good reasons" for the weight assigned to a 2015 Functional Capacity Evaluation (FCE). *Hargett v. Comm'r of Soc. Sec.*, 964 F.3d 546, 553-54 (6th Cir. 2021).

On October 23, 2018, while Mr. Hargett's DIB claim was pending in the federal courts, he filed an application for SSI, alleging a disability onset date of September 1, 2018. (Tr. 106, 278). His claim was denied initially and on reconsideration. (Tr. 106-45). At Mr. Hargett's request, the ALJ held a joint hearing on the DIB and SSI claims; the ALJ noted the subsequently filed SSI claim does not involve an overlapping period of time with the DIB claim. (Tr. 246, 705).

After hearing additional testimony from Mr. Hargett (*see* Tr. 24-66), the ALJ issued a second decision on September 21, 2021, again denying Mr. Hargett's claim for DIB because he was not disabled on or before his DLI, March 31, 2016. (Tr. 726). The ALJ issued a partially favorable decision on Mr. Hargett's SSI claim, finding that he was not disabled between October 23, 2018, and March 4, 2020, but became disabled on March 5, 2020 – the day before his 55th birthday – when he became "an individual of advanced age" under 20 C.F.R. § 416.963. (Tr. 752, 745). The Appeals Council denied Mr. Hargett's request for review, making the 2021 hearing

decision the Commissioner's final decision. (Tr. 2-6; *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, and 416.1481). Mr. Hargett timely filed this action on October 4, 2022. (ECF #1).

FACTUAL BACKGROUND

## I.      PERSONAL AND VOCATIONAL EVIDENCE

Mr. Hargett was 51 years old on his DLI and turned 55 years old on March 6, 2020. (Tr. 725, 752). He completed high school. (Tr. 725). He previously worked as an industrial cleaner, a construction equipment mechanic, a municipal road maintenance worker, and a scrap truck driver. (Tr. 724).

## II.     ADMINISTRATIVE HEARING TESTIMONY & WRITTEN STATEMENTS

The ALJ summarized Mr. Hargett's written statements and testimony relevant to the DIB claim as follows:

> Written statements offered in support of the claimant's Title II application allege disability because of high blood pressure and high cholesterol, type 2 diabetes, curvature of the spine, COPD, sleep apnea, and depression and anxiety. Mr. Hargett described breathing problems as running out of breath on taking even a short walk, difficulties in sitting and standing as well as walking due to his back condition, and needing to use a C-PAP device every night. He stated that he can lift or carry 25 to 40 pounds at most and identified difficulties with reaching, kneeling, climbing stairs, and bending. He did not assert any side effects from taking prescribed medications or from using inhalers. As discussed above, he did not identify any significant limitations in mental functioning.

> Subsequent statements accompanying the claimant's requests for reconsideration and for this hearing allege progression of diabetes to insulin-dependent status and high blood sugars up to 400, increasing pain in his spine with back spasms, and labored breathing during periods of heat and humidity.

> At the November 2017 hearing in relation to the Title II claim, and with a focus on the period through the March 2016 date last insured, the claimant testified that he could not work primarily because of shortness of breath from COPD, becoming extremely dizzy when lifting things, and being affected in breathing when it is extremely hot outside or when he is in proximity to a person wearing heavy perfume. Mr. Hargett testified that he was also unable to work because of the

3

additional impact of lower back pain and symptoms of uncontrolled diabetes
including dizziness and headaches when his blood sugars increase to 300-500 range.
He testified that he felt tired and was taking daily naps. He testified that his
hypertension has been under control with a medication (Losartan). Due to these
physical health conditions and related symptoms, his testimony imparted that he
could walk only 100-150 feet before needing to stop, could stand for a maximum of
20 minutes before needing to sit, could lift at heaviest a gallon of water (eight
pounds) repeatedly, but could not lift 10-15 pounds more than one time due to his
back.

(Tr. 713-14).

A vocational expert, Robert A. Mosley, identified Mr. Hargett's past relevant work as semi-truck driver (DOT #904.638-010), municipal worker (DOT #899.684-046), maintenance mechanic (DOT #638.281-014), and industrial cleaner (DOT #381.687-018). (*See* Tr. 84). He testified that a hypothetical individual of Mr. Hargett's age, education, and experience could not perform Mr. Hargett's past relevant work if limited to light work and subject to the following restrictions: occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; avoid concentrated exposure to extreme cold, extreme heat and humidity, and fumes, odors, dusts, gases, poor ventilation, and other pulmonary irritants; and avoid all exposure to hazards such as unprotected heights, moving mechanical parts, and operating motor vehicles. (*See* Tr. 81, 84). The VE identified three light exertion, SVP 2 jobs the hypothetical individual could perform under those restrictions: (1) inspector and hand packager (DOT #559.687-074); (2) assembler, plastic hospital products (DOT #712.687-010); and (3) assembler, electrical accessories I (DOT #729.687-010). (*See* Tr. 85-86).

### III.    RELEVANT MEDICAL EVIDENCE[2]

On January 15, 2015, Mr. Hargett met with primary care physician Nathan Lucardie, M.D. (Tr. 602). There, Mr. Hargett recounted his visit to the emergency room on January 11 for exacerbated COPD where he was treated with an inhaler and prednisone; he endorsed feeling better after treatment but continued to experience dyspnea (shortness of breath) that became worse with exertion. (*Id.*). On examination, Dr. Lucardie noted diffuse expiratory wheezing. (Tr. 603). Dr. Lucardie reviewed the ER records and noted Mr. Hargett's chest X-ray showed only chronic changes. (*Id.*). Spirometry PFT testing, without the use of a bronchodilator, revealed an $FEV_1$ of 1.91 L, a "moderately severe obstruction." (Tr. 603, 634). Dr. Lucardie continued Mr. Hargett's prescription for albuterol sulfate HFA and prescribed Breo. (Tr. 603).

On April 15, 2015, Mr. Hargett returned to Dr. Lucardie's office for follow-up after visiting the ER on April 6 for chest pain. (Tr. 598-99). Based on normal stress testing completed at the ER (Tr. 579-80), Dr. Lucardie felt Mr. Hargett's pain was likely related to "back pain/nerve issues." (Tr. 599). Mr. Hargett's blood pressure was high and respiratory examination revealed lungs clear to auscultation bilaterally, without wheezes, rhonchi, or rales. (*Id.*). Dr. Lucardie switched Mr. Hargett's blood pressure medication, ordered a new glucometer for Mr. Hargett to test his blood sugar levels at home, and refilled his CPAP supplies. (Tr. 600).

On May 13, 2015, Mr. Hargett met with Dr. Lucardie for a follow-up appointment and reported tolerating the new blood pressure medication. (Tr. 596). He complained of COPD symptoms including increased coughing and wheezing and endorsed using his inhaler frequently.

---

[2]    My summary of the medical evidence is not comprehensive and reflects the medical evidence most relevant to Mr. Hargett's DIB claim.

(*Id.*). Mr. Hargett's blood pressure reading improved compared to his previous office visit, but he displayed diffuse inspiratory and expiratory wheezing bilaterally. (Tr. 597). Dr. Lucardie prescribed Victoza for diabetes mellitus, continued the blood pressure medication, and, for chronic airway obstruction, continued prescriptions for albuterol sulfate HFA and Breo and added doxycycline hyclate. (Tr. 597-98).

On August 5, 2015, Mr. Hargett returned to Dr. Lucardie's office for a follow-up appointment and reported very high blood sugar readings at home. (Tr. 594). Mr. Hargett noted his COPD symptoms were worse in the summer and endorsed frequent use of his inhaler. (*Id.*). Though improved, respiratory examination revealed continued diffuse inspiratory and expiratory wheezing bilaterally. (Tr. 595). Dr. Lucardie refilled Mr. Hargett's medications and increased his dose of Victoza. (*Id.*).

On January 27, 2016, Mr. Hargett saw Dr. Lucardie and complained of an acute exacerbation of COPD symptoms, including cough, wheezing, and chest tightness. (Tr. 634). He also complained of shortness of breath, dyspnea on exertion, and cough. (*Id.*). Mr. Hargett endorsed using Spiriva daily. (*Id.*). General examination revealed slightly labored respiration, prolonged expiration, and diffuse expiratory wheezing. (Tr. 635). Dr. Lucardie diagnosed COPD exacerbation, continued Mr. Hargett's medications, and prescribed prednisone, an antibiotic, and a nebulizer device. (*Id.*).

On March 17, 2016, Mr. Hargett reported elevated blood sugar levels, shortness of breath, dyspnea on exertion, daily use of Spiriva and Breo, and increased use of the nebulizer. (Tr. 631). Respiratory examination revealed continued, but improved, diffuse inspiratory and expiratory wheezing bilaterally. (Tr. 632). Dr. Lucardie discontinued Glimepiride and prescribed Tresiba for

6

uncontrolled diabetes type 2. (*Id.*). Dr. Lucardie also continued prescriptions for Spiriva, Breo, albuterol sulfate HFA, and nebulizer treatment to address symptoms of COPD. (Tr. 633).

Throughout the remainder of 2016, respiratory examinations revealed faint expiratory wheezing and Mr. Hargett continued to complain of shortness of breath and dyspnea on exertion. (Tr. 628-29, 637-38, 640-645, 658-59). Spirometry testing, dated April 21, 2016, revealed an $FEV_1$ of 2.29. (Tr. 629).

## IV. MEDICAL OPINIONS

In December 2015, upon referral from Dr. Lucardie, Mr. Hargett visited physical therapist John Capple at the MediGraph Testing Facility for a Quantified Functional Capacity Evaluation (FCE). (Tr. 612-16). The test is described as follows:

> This FCE is based on the Dictionary of Occupational Titles-Residual Functional Capacity (DOT-Quantified) Battery. The DOT-Quantified consists of a battery of job-related tasks from job factors defined in the Dictionary of Occupational Titles (DOT). The DOT-Quantified battery is one of the few functional capacity evaluations that has been published in peer-reviewed journals. The DOT-Quantified battery has the distinction of being published in two journals. The importance of publication in a peer-reviewed journal cannot be overstated. Unlike the majority of unpublished functional capacity evaluations, the reliability and validity of the DOT-Quantified battery has been established.

(Tr. 612). The test was designed to meet State-established standards and provide quantification of the specific areas of disability revealed during the FCE. (*Id.*). The test "also satisfies other required parameters to measure ADL and co-efficient of variation testing to validate client effort." (*Id.*) (citations omitted).

During the test, Mr. Hargett stood for 5 minutes continuously; sat for 30 minutes continuously; walked for 0.1 miles; reached for objects in all directions; climbed up and down a flight of steps; kneeled on one and both knees; and seized, held, grasped, and turned objects in

either hand. (Tr. 613-15). He was unable to stand or crouch on a narrow beam for 30 seconds,

walk on a narrow beam for at least 6 feet, crouch by stooping at least 75 degrees while bending

both knees, stoop by flexing the trunk at least 75 degrees, or crawl on hands and knees or hands

and feet for 6 feet. (*Id.*). The test also measured Mr. Hargett's lifting, carrying, pushing, and pulling

capacities, the results of which revealed the following maximum capacities: lift 35 pounds

occasionally, 17.5 pounds frequently; carry 20 pounds occasionally, 10 pounds frequently; pushing

45 pounds; and pulling 40 pounds. (Tr. 613). The only test Mr. Hargett did not complete was the

pickup fingering test. (Tr. 616).

Based on testing, to which Mr. Hargett displayed fair effort, Mr. Hargett could return to

work if limited to the following:

- No standing for more than five minutes continuously;
- No walking for more than 0.1 miles continuously;
- No pushing more than 45 pounds;
- No pulling more than 40 pounds;
- No balancing activities that require standing;
- No balancing activities that require crouching;
- No balancing activities that require walking;
- No crouching;
- No stooping; and
- No crawling.

(Tr. 615). PT Capple noted Mr. Hargett's dyspnea was exacerbated by walking a short distance,

carrying, climbing, and lifting. (Tr. 616). PT Capple cautioned that the results derived from the

test cannot be completely conclusive in light of the incomplete pickup fingering test. (*Id.*). Dr.

Lucardie reviewed the results and affixed his signature in the space provided. (*Id.*).

On February 18, 2016, at the behest of the state Division of Disability Determination, Mr.

Hargett attended a consultative examination with Sushil M. Sethi, M.D. (Tr. 620-26). Physical

examination revealed good airway entry into both lungs, with occasional expiratory wheezes and

rhonchi scattered bilaterally, and he could not walk on his heels or his tiptoes. (Tr. 621). Otherwise, Mr. Hargett had a normal gait while walking in the office, largely normal range of motion in the upper and lower extremities and spine; normal muscle testing; and normal grasp, manipulation, pinch, and fine coordination bilaterally. (Tr. 623-26). Dr. Sethi opined Mr. Hargett's ability to do work-related physical activities such as sitting, standing, walking, lifting, carrying, and handling objects may be slightly affected. (Tr. 622). He can sit, walk, and stand for eight hours each and carry twenty to thirty pounds occasionally, ten to fifteen pounds frequently. (*Id.*). The ALJ gave considerable weight to Dr. Sethi's medical opinion because, although based on a one-time examination, it was supported by the doctor's physical examination and "largely consistent with other medical evidence," including increases and adjustments to medications for COPD and diabetes, but "no mentioned symptoms of pain or fatigue from any medical conditions." (Tr. 720).

On February 26, 2016, Venkatachala Sreenivas, M.D., a state agency medical consultant, reviewed Mr. Hargett's records and in light of the limitations caused by COPD, determined he could lift and carry up to 50 pounds occasionally, 25 pounds frequently; stand and/or walk and sit for six hours each in an eight-hour workday; and must avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation, and avoid all exposure to unprotected heights and heavy machinery. (Tr. 768-70). Based on limitations due to a combination of COPD, hypertension, sleep apnea, and obesity, Dr. Sreenivas determined Mr. Hargett could frequently climb ramps and stairs but never climb ladders, ropes, or scaffolds; frequently stoop, kneel, and crouch; and occasionally crawl. (*Id.*). On May 21, 2016, state agency medical consultant William Bolz, M.D., agreed with and adopted Dr. Sreenivas's findings. (Tr. 783-84).

9

Mr. Hargett claims the ALJ should have considered Dr. Lucardie's opinions post-dating his DLI (March 31, 2016) because the opinions and supporting records are relevant to his health condition before the expiration of DLI. (Pl.'s Br., ECF #11, PageID 810). Therefore, I include Dr. Lucardie's 2021 opinion here. In 2021, Dr. Lucardie wrote a letter stating:

> [Mr. Hargett] suffers from severe COPD/emphysema, uncontrolled type 2 diabetes, hypertension, obstructive sleep apnea, morbid obesity, carpal tunnel syndrome, ulnar neuropathy, restless legs syndrome, and hyperlipidemia.
>
> His medical conditions have and continue to cause significant debility affecting his ability to work. Mr. Hargett has severe COPD with lung capacity of 35-40% of predicted for his age, sex, and height. This causes significant shortness of breath with minimal exertion. On examinations in office, he regularly exhibits shortness of breath with exertion and wheezing on lung exam.
>
> His functional capacity is further limited by musculoskeletal conditions including osteoarthritis, carpal tunnel syndrome and ulnar neuropathy. These are affected by diabetes and morbid obesity which affect physical functioning. I have reviewed recent functional capacity evaluations from 2015 and July 2021, which show similar results, and I concur with the findings of significantly functional limitations with worsening gait imbalance. Based on these findings and his limited lung capacity I believe Mr. Hargett would not be able to perform work above a sedentary exertional level would not be able to sustain full time work.

(Tr. 665).

### THE ALJ'S DECISION

The ALJ's decision included the following findings of fact and conclusions of law:

1.   The claimant last met the insured status requirements of the Social Security Act on March 31, 2016

2.   The claimant did not engage in substantial gainful activity during the period from his alleged onset date of March 6, 2015 through his date last insured of March 31, 2016 (20 CFR 404.1571 *et seq.*).

3.   Through the date last insured, the claimant had the following severe impairments: degenerative disc disease (DDD) of the thoracic and lumbar spine, osteoarthritis, chronic obstructive pulmonary disease (COPD) and emphysema with chronic airway obstruction, obstructive sleep apnea,

hypertension, type 2 diabetes mellitus, carpal tunnel syndrome of the right upper extremity, and obesity (20 CFR 404.1520(c)).

4.  Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5.  After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform light work, as defined in 20 CFR 404.1567(b), except that he was further limited in the following nonexertional respects: Could never climb ladders, ropes, or scaffolds but could occasionally climb ramps and stairs; could occasionally stoop, crouch, kneel, and crawl; and could frequently balance; could frequently handle and frequently finger with the bilateral upper extremities; needed to avoid concentrated exposure to extreme heat and extreme cold, to humidity, and to pulmonary irritants such as fumes, odors, dusts, gases, and poor ventilation; and needed to avoid all exposure to hazards such as unprotected heights and moving mechanical parts.

6.  Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.  The claimant was born on March 6, 1965 and was 51 years old, which is defined as an individual closely approaching advanced age, on the date last insured (20 CFR 404.1563).

8.  The claimant has at least a high school education (20 CFR 404.1564)

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant was "not disabled," whether or not the claimant has transferable job skills (*see* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1695a).

11.  The claimant was not under a disability, as defined in the Social Security Act, at any time from March 6, 2015, the alleged onset date, through March 31, 2016, the date last insured (20 CFR 404.1520(g)).

(Tr. 708-26).

STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial

12

evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security,* 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4.    What is claimant's residual functional capacity and can claimant perform past relevant work?

5.    Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity (RFC) to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) and 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Mr. Hargett claims the ALJ's RFC is not supported by substantial evidence for two reasons. First, the ALJ did not consider Dr. Lucardie's 2021 medical opinion or the 2021 functional capacity evaluation in his assessment of the DIB claim under Title II. (Pl.'s Br., ECF #11, PageID 810). Second, the ALJ's assigning "little weight" to the 2015 functional capacity evaluation, the findings of which Dr. Lucardie adopted, was not supported by substantial evidence and the reasons for the weight given were not "good reasons." (*Id.* at PageID 812, 814). The Commissioner respond that the ALJ provided good reasons supported by substantial evidence for the weight assigned to Dr. Lucardie's 2015 opinion. (Comm'r's Br., ECF #14, PageID 842). The Commissioner also contends the ALJ appropriately determined the 2021 functional capacity

14

evaluation and Dr. Lucardie's 2021 opinion does not relate back to Mr. Hargett's DIB claim, and even if the ALJ erred in this respect, the error was harmless. (*Id.* at PageID 845).

## A.     Treating Physician Rule

In evaluating medical opinions in cases filed before March 27, 2017, an ALJ must give the medical opinion of a claimant's treating physician "controlling weight" if "it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2); *see Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir. 2004). This was commonly known as the "treating physician rule." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 242 (6th Cir. 2007). The rationale for the rule is simple: Because treating physicians are "the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone," their opinions are generally accorded more weight than those of non-treating physicians. *Id.* (quotation omitted). Failure to assign a specific weight to the treating physician's assessment "alone constitutes error." *Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011). "Even if the treating physician's opinion is not given controlling weight, 'there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference.'" *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir.2009) (quoting *Rogers,* 486 F.3d at 242).

In addition to the treating physician rule, an ALJ must abide by the "good reasons requirement." *Fox v. Comm'r of Soc. Sec.,* 827 F. App'x 531, 536 (6th Cir. 2020). "Separate from the treating physician rule, but closely related, is the requirement that the ALJ 'always give good reasons' for the weight ascribed to a treating-source opinion." *Hargett v. Comm'r of Soc. Sec.,* 964

15

F.3d 546, 552 (6th Cir. 2020) (quoting 20 C.F.R. § 404.1527(c)(2)); *see also* SSR 96-8p, 1996 WL

374184, at *7 ("If the RFC assessment conflicts with an opinion from a medical source, the

adjudicator must explain why the opinion was not adopted."). To satisfy the requirement, the

ALJ's reasons must be sufficiently specific so as to help "claimants understand the disposition of

their cases," and "permit[ ] meaningful appellate review of the ALJ's application of the [treating

physician] rule." *Rogers*, 486 F.3d at 242-43 (quotation omitted); *see* SSR 96-2p, 1996 WL 374188,

at *5.

       The ALJ "may not summarily discount a treating-source opinion as not well-supported by

objective findings or being inconsistent with the record without identifying and explaining how

the substantial evidence is purportedly inconsistent with the treating-source opinion." *Hargett*, 964

F.3d at 552; *see also Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 552 (6th Cir. 2010) (per

curiam). If the ALJ does not give controlling weight to the treating physician's opinion, he must

determine the weight to give the opinion by looking at other factors, including "the length of the

treatment relationship and the frequency of examination, the nature and extent of the treatment

relationship, the supportability of the opinion, consistency of the opinion with the record as a

whole, and any specialization of the treating physician." *Fox*, 827 F. App'x at 536 (quotation

omitted); *see also* 20 C.F.R. § 404.1527(c)(2)(i)-(ii), (3)-(6). The mere recitation of facts in the

record, unaccompanied by explanations as to how those facts bolster one opinion and weaken

another, is not sufficient. "[T]here must be some effort to identify the specific discrepancies and to

explain why it is the treating physician's conclusion that gets the short end of the stick." *Friend*,

375 F. App'x at 552.

These procedural requirements are "not simply a formality" and are intended "to safeguard the claimant's procedural rights." *Cole*, 661 F.3d at 937. As a result, courts will remand "when we encounter opinions from ALJs that do not comprehensively set forth the reasons for the weight assigned to a treating physician's opinion." *Wilson*, 378 F.3d at 545.

Even if substantial evidence supports the ALJ's weighing of the treating physician opinions, "substantial evidence alone does not excuse non-compliance with 20 C.F.R. § 404.1527(c)(2) as harmless error." *Blakley*, 581 F.3d at 410; *Wilson*, 378 F.3d at 546 ("A court cannot excuse the denial of a mandatory procedural protection simply because, as the Commissioner urges, there is sufficient evidence in the record for the ALJ to discount the treating source's opinion . . ."). A violation of the treating physician rule might be harmless error if (1) "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it"; (2) "if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion"; or (3) "where the Commissioner has met the goal of § 404.1527(d)(2)—the provision of the procedural safeguard of reasons—even though [he] has not complied with the terms of the regulation." *Wilson* 378 F.3 at 547. "In the last of these circumstances, the procedural protections at the heart of the rule may be met when the 'supportability' of a doctor's opinion, or its consistency with other evidence in the record, is indirectly attacked elsewhere in his analysis of another physician's opinion or the analysis of the claimant's ailments." *Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 470-72 (6th Cir. 2006); *Hall v. Comm'r of Soc. Sec.*, 148 F. App'x 456, 464 (6th Cir. 2006).

### 1.    Dr. Lucardie's 2021 Medical Opinion

Dr. Lucardie's 2021 medical opinion, set forth above, refers to and adopts the findings of a July 2021 FCE that suggests Mr. Hargett can tolerate a three- to four-hour workday; can sit for four

hours total, one hour continuously; can stand for a total of zero hours, five minutes continuously; and can walk one to two hours total, short distances continuously. (Tr. 575). Mr. Hargett could occasionally lift 12.6 pounds, push and pull 24.5 pounds, and carry 17 pounds. (*Id.*). He could minimally occasionally balance, climb stairs, and use his right foot; occasionally use his left foot, perform tasks involving simple, firm, and fine grasping, and flex and rotate the neck; and frequently hold the neck in a static position but could never bend/stoop, crawl, crouch, kneel, or squat. (*Id.*). The ALJ determined the medical opinions post-dating Mr. Hargett's DLI, including this functional capacity evaluation and Dr. Lucardie's 2021 opinion, do not have any connection to the limited period at issue for the DIB claim. (Tr. 723-24).

An ALJ is required to consider a medical opinion issued after the DLI only to the extent that the limitations provided in the opinion relate back to the period predating the DLI. *Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 849-50 (6th Cir. 2020). Generally, evidence post-dating the DLI has little probative value "unless it illuminates the claimant's health before the insurance cut-off date." *Grisier v. Comm'r of Soc. Sec.*, 721 F. App'x 473, 477 (6th Cir. 2018). Evidence of a claimant's post-DLI condition, to the extent it relates back, is relevant only if it reflects a claimant's limitations prior to the DLI, rather than merely his impairments or condition prior to this date. *See* 20 C.F.R. § 416.945(a)(1) ("Your impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what you can do in a work setting. Your residual functional capacity is the most you can still do despite your limitations."); *see also Higgs*, 880 F.2d 860, 863 (6th Cir. 1988) (noting that "mere diagnosis . . . says nothing about the severity of the condition."). Where post-DLI evidence establishes the claimant's impairments existed continuously and in the same degree as before the expiration of the claimant's DLI, the evidence is

relevant and should be considered. *Lowery v. Comm'r of Soc. Sec.*, 886 F. Supp. 2d 700, n.8 (S.D. Ohio 2012).

Mr. Hargett claims Dr. Lucardie's 2021 opinion is relevant to his medical condition before his DLI, March 31, 2016, because Dr. Lucardie "discussed all the conditions he has treated [Mr. Hargett] for 'since 2009,'" "specifically referenced the lung capacity testing that was completed before the DLI, which he tied to [Mr. Hargett's] 'severe COPD,'" and noted the 2015 and 2021 functional capacity tests "showed similar results." (ECF #11 at PageID 811).

I disagree. Simply reciting a claimant's medical history does not act to relate the medical condition back to an earlier date. *Abney v. Astrue*, No. 5:07-394-KKC, 2008 WL 2074011, at *7 (E.D. Ky. May 13, 2008). Equally detrimental to Mr. Hargett's argument is Dr. Lucardie's indication that his condition was worse in 2021 than in 2015 and early 2016. (*See* Tr. 665) ("I concur with the findings of significant[] functional limitations with *worsening* gait imbalance.") (emphasis added). Although Dr. Lucardie claimed the 2015 and 2021 FCE's showed similar results, the results of the latter evaluation suggested reduced lifting and carrying capacities, a reported inability to kneel, and reduced ability to grasp and manipulate objects. (*Compare* Tr. 571-75 with Tr. 612-16). When discussing the 2021 evaluation in relation to the SSI claim, the ALJ noted Mr. Hargett complained of several *new* symptoms for the first time during the evaluation. (Tr. 748). Therefore, considering the low bar necessary to meet the substantial evidence standard, there is substantial support for the ALJ's determination that the 2021 evaluation and opinion are not relevant to showing the severity of Mr. Hargett's impairments before the expiration of his DLI.

## 2.     Dr. Lucardie's 2015 Medical Opinion

Next, Mr. Hargett claims the ALJ did not identify good reasons for the weight afforded to Dr. Lucardie's 2015 medical opinion. (ECF #11 at PageID 812-17). The ALJ identified several reasons for the weight assigned to Dr. Lucardie's 2015 opinion and results of the FCE:

> The FCE was a one-time evaluation, and its conclusions for the "job factor restrictions" listed above as well as for medium strength capacity in lifting and carrying (and pushing and pulling) were supported by similar one-time observations by Mr. Capple of what the claimant did, without more observation offered than "his physical limitations exacerbated his dyspnea related to his COPD including walking short distances, carrying, climbing, and lifting." For instance, Mr. Capple assigned several of the restrictions in postural positionings not being able to perform them during the FCE. Likewise, he based the 0.1 miles of continuous walking and 5 minutes of continuous standing on the claimant having done so at the FCE. Regardless of ratification by co-signature, such observations from a physical therapist do not constitute "medically acceptable" clinical findings or laboratory diagnostic techniques, and this factor alone prevents assigning controlling weight to the FCE's conclusions. Further detracting from supportability even on its own findings, the FCE's conclusions were expressly qualified by Mr. Capple in that "not all tests were completed" and, as such, "the results derived from this exam cannot be completely conclusive."

> The FCE's conclusions also fail the second element of the controlling weight analysis—they are not even remotely consistent with the other substantial medical and other evidence in the case record. Primarily, the claimant portrayed none of the functional inabilities at the consultative physical examination done two months after the FCE, whether from shortness of breath or other conditions, and at most had some limitations in mobility of the lumbar spine that would not at all suggest no abilities to stoop, to crouch, to kneel, or to maintain balance. Dr. Lucardie's own office notes from 2015 and early 2016 do not show any significant medical signs other than relating to some diffuse wheezing that was "improved" with addition of the nebulizer machine and ongoing use of the daily inhaler for COPD, do not suggest any significant pain or musculoskeletal problems over the period through and one month after the date last insured, and do not extend examinations beyond basic body systems (general/constitutional, head/ears/eyes/nose/throat, abdominal, cardiovascular, and respiratory). The two spirometry studies done in early 2015 and 2016 do show reduced forced expiratory volume interpreted as a "moderately severe" obstruction, which is consistent with the diagnosis of COPD, but with improvement in this at the latter study ($FEV_1$ from 1.91 to 2.29), and this does not explain the very limited standing and walking tolerances displayed at the FCE, and no exertional dyspnea observed clinically by

Dr. Sethi during performance of physical maneuvers during the consultative examination two months after the FCE. Ultimately, these exemplary points of evidence prevent me from finding that the December 2015 FCE's conclusions are not inconsistent with the other substantial medical evidence in the record, and no controlling weight can be given to these conclusions for this separate and additional reason.

Thus turning to the other factors for all medical opinions, set forth in 20 CFR 404.1527(c), I have given little weight to the FCE's conclusions as endorsed and ratified by Dr. Lucardie's co-signature for many of the reasons discussed above, which show limited supportability from any strong clinical observations as to why the claimant would have been so limited in standing, walking, and postural abilities and yet capable of lifting and carrying, pushing and pulling, within the range of medium exertion as well as an overall inconsistency of the FCE's conclusions with his own office notes, reasons for seeking treatment, and Dr. Sethi's medical signs and observations. The treating relationship is not of a medical specialization, as Dr. Lucardie is the claimant's primary care physician. The frequency of treatment over 2015-2016 is also relatively low, per office notes at once every two to four months and, at points, more distanced. In fact, the December 2015 FCE occurred four months after the preceding office visit in early August 2015. To be sure, the nature of Dr. Lucardie's treatment extended to all physical health conditions (as well as "mild" anxiety discussed above), but the scope and type of treatments remained conservative over the relevant period, without any indication of needing to refer the claimant to specialists in pulmonology, endocrinology, or orthopedics. Again, I emphasize here that no musculoskeletal symptoms or examinations were conducted by Dr. Lucardie through April 2016, and many of the inabilities displayed by the claimant and accepted by the examining physical therapist and signed onto by Dr. Lucardie are not reasonably explained by the 2015-2016 office notes for symptoms of exertional dyspnea and some wheezing, which improved with enhanced treatment, and yet without any observations about the claimant visibility becoming short of breath when walking in-office distances or when standing at station. Ultimately, the FCE's conclusions received little weight for their disconnect with the longitudinal treatment notes exclusively with primary care practice, for lack of objective medical evidentiary support from the claimant's own treating physician's office notes and from the consultative examination, for inconsistencies with many other points of relevant evidence cited herein but also discussed in the preceding parts of this Finding, and for other reasons relating to relatively infrequent visits with the primary care physician alone and without specialist evaluation or treatment being indicated at any point.

(Tr. 722-23).

The ALJ's claim that a physical therapist's observations do not constitute "medically acceptable" clinical or laboratory diagnostic techniques, in these circumstances, is not a tenable reason to discount the opinions because the opined functional limitations are not based on PT Capple's observations, but on a DOT-quantified battery of job-related tasks, the reliability and validity of which has been established in peer-reviewed publications. (Tr. 612). The ALJ's conclusion that the opinions are not supported by "medically acceptable" clinical and laboratory diagnostic techniques is particularly puzzling here because, on appeal from the ALJ's first written decision, the Sixth Circuit determined the FCE's opinions are "based on objective observation and defined criteria." *Hargett*, 964 F.3d at 554. However, as discussed below, the ALJ identified and sufficiently articulated other good reasons for the weight assigned to Dr. Lucardie's 2015 opinion.

Mr. Hargett next faults the ALJ for finding the spirometry studies inconsistent with the very limited standing and walking tolerances displayed at the FCE. (ECF #11 at PageID 814). Mr. Hargett acknowledges the 2016 $FEV_1$ result is an improvement over the 2015 test but argues the improvement in test results does not "disprove the validity of the FCE results," and the ALJ inappropriately interpreted raw medical data when assessing the functional limitations stemming from COPD. (*Id*.). Belying Mr. Hargett's contention is his own doctor's interpretation of the worst spirometry test results, representing a "moderately severe obstruction." (Tr. 603, 634). The adjective alone does not necessarily show that Mr. Hargett does not suffer from shortness of breath on exertion, but elsewhere in the decision the ALJ emphasized Mr. Hargett's "ongoing activity doing farm-related work," including bailing 190 acres of hay during the relevant period of alleged disability, is inconsistent with the alleged lifting, carrying, standing, and walking limitations and general exertional intolerance. (Tr. 719). The ALJ also noted Dr. Sushil, the consultative medical

examiner, did not observe any exertion-related shortness of breath on evaluation two months after the FCE. (Tr. 723).

The ALJ explicitly considered the required factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician. (Tr. 723; *see* 20 C.F.R. § 404.1527(c)(2)(i)-(ii), (3)-(6)). He emphasized the "relatively low" frequency of treatment; the conservative nature of treatment, including improved diffuse wheezing with nebulizer and inhaler treatments; the lack of referral to a specialized physician for treatment of COPD; and the inconsistency of the opinion with other medical opinions and the largely normal and improved physical examination findings. (Tr. 723). Considered as a whole, the written decision adequately identifies and articulates good reasons for assigning little weight to the FCE's conclusions.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **AFFIRM** the Commissioner's decision denying disability insurance benefits under Title II.

Dated: August 17, 2023

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

OBJECTIONS, REVIEW, AND APPEAL

Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).